UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. 5:22-CR-058-H-BQ-1 |
| | ) |
| BRANDON JOE GOODAN, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

SENTENCING HEARING
BEFORE THE HONORABLE JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE
JANUARY 26, 2023
LUBBOCK, TEXAS

FOR THE PLAINTIFF:

    ANN HOWEY
    UNITED STATES ATTORNEY'S OFFICE
    1205 Texas Avenue, Suite 700
    Lubbock, TX  79401
    (806) 472-7351

FOR THE DEFENDANT:

    SARAH GUNTER
    OFFICE OF FEDERAL PUBLIC DEFENDER
    1205 Texas Avenue, Room 507
    Lubbock, TX  79401
    (806) 472-7236

    Proceedings reported stenographically; transcript produced by computer-aided transcription.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

(Proceedings commenced at 10:52 AM.)

THE COURT:  The Court calls the next case of the morning, *United States versus Brandon Joe Goodan*, Case 5:22-CR-58-1.

Who's here on behalf of the Defendant?

MS. GUNTER:  Sara Gunter for the Defense.  We're present and ready to proceed, Your Honor.

THE COURT:  Thank you, Ms. Gunter.

For the United States?

MS. HOWEY:  Ann Howey for the United States of America.  Ready to proceed.

THE COURT:  Thank you, Ms. Howey.

Mr. Goodan, good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Please tell me your full name, sir.

THE DEFENDANT:  Brandon Joe Goodan.

THE COURT:  Mr. Goodan, let's talk about your case for a second and how we got here today.

You previously appeared before Magistrate Judge Bryant back in October.  You pled guilty to Count One of the Indictment charging you with escape from federal custody.  Judge Bryant found that your guilty plea was knowing and voluntary and supported by a sufficient factual basis.  So he recommended that I accept your guilty plea and I did.

On October 24th I entered an Order accepting your plea

and adjudging you guilty of the crime alleged in the Indictment against you.

Sir, I know it's the first time you and I are seeing each other during this process, but I want you to know I'm very familiar with this case.  The Court has reviewed all of these materials, and I'm ready to proceed today.  Okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  Ms. Gunter, have you had an opportunity to the read the Presentence Report and its addendum and discussed them with your client?

MS. GUNTER:  Yes, Your Honor.

THE COURT:  Mr. Goodan, have you had an opportunity to read your Presentence Report and its addendum and discuss them with your attorney?

THE DEFENDANT:  Yes, sir.

THE COURT:  You understand we're here so I can decide what sentence to impose?

THE DEFENDANT:  Yes, sir.

THE COURT:  Ms. Gunter, I know you filed a couple of clarifying objections.  Those have been adopted in the addendum and you have no further objections.  Is that right?

MS. GUNTER:  That is correct, Your Honor.

THE COURT:  Any objections from the United States?

MS. HOWEY:  No, Your Honor.

THE COURT:  Hearing no objections, I do adopt the PSR

and the PSR Addendum's factual findings and legal conclusions as my own.

Sir, the statutory sentencing range, so the total possible range of punishment, is a term of imprisonment of not more than five years, a fine of $250,000 or both, and a period of supervised release of up to three years.

Under the *Guidelines Manual*, we have a Total Offense Level of 7, a Criminal History Category of VI, which results in an advisory guideline range of 15 to 21 months' imprisonment.

Ms. Gunter.

MS. GUNTER:  Thank you, Your Honor.

Your Honor, the first things I want to talk to you about are the differences that Brandon made in his life after he was released from prison in the lead-up to this case.

The PSR provides details about trauma suffered by Brandon during his childhood.  Given the horrific incidents that he endured, it's not surprising that he has struggled with mental health and drug addiction throughout his life.

When Brandon was released from the BOP and on home confinement, he obtained two jobs.  He was working at Pizza Hut and at Abimar Foods.  He even received a promotion to a supervisory position at Abimar Foods not long after having started there.

Brandon got an apartment.  He obtained insurance, and he was paying his own bills for the first time in his life.  This

was a source of great pride for him because he had never paid his own bills before.  We've talked at length about what was going on in his life, and I can't adequately describe to you the excitement that he had over the fact that he was paying his own bills.

He was staying clean.  His past was checkered with drug issues, and his go-to had always been methamphetamine before he was incarcerated in 2015 on the previous federal case.

So when he relapsed in 2022, it was with marijuana.  He recognizes that that was a wrong choice.  He shouldn't have made that decision but, on the other hand, he is also pleased that he did not go back to methamphetamine.  He didn't take as big of a setback as he would have in previous years.  He's very happy that he managed to stay off of meth.

Paragraph 71 of the PSR tells us about how he disassociated from previous negative influences even to the potential detriment of himself.  That may come at a heavy cost, but he did distance himself from the people that he shouldn't be around.

He was advocating for his mental health needs.  As part of our sentencing memorandum, we provided the Court with e-mails which indicate how much he was advocating on his behalf for mental health help through counseling and medication.

Your Honor, during his incarceration on this case, he's been receiving mental health meds.  And through all of that, he

has come to recognize that he acts impulsively when he doesn't have his mental health medication, and his anxiety fuels his impulse control issues.  He is confident that if he had had his mental health meds in June of 2022, he would have made a much better decision than he did when he left the halfway house.

In December of 2022 Brandon was moved from the Rolling Plains facility to the Eden Detention Center.  After arriving at Eden, he discovered that there were multiple classes available to him there, and he quickly availed himself of those classes. We've provided those Certificates of Completion to the Court. However, I'd like to highlight the classes that he chose.

THE COURT:  Okay.

MS. GUNTER:  Bringing the Full Power of Science to Bear on Drug Abuse and Addiction, Anger Management, Adopting to Change, Starting Over, Mundanity, Healing the Wounded Man, Managing Stress, Critical Thinking and Decision-Making.

Your Honor, these aren't classes that he took just to pass the time.  Those are classes that are targeted at the needs that he has in addressing the issues that he has dealt with.  I think that his choice of these classes demonstrates a level of self-awareness that Brandon has previously lacked.

Your Honor, we also submitted support letters, and I want to highlight some of those for you as well.

You received a letter from Dr. Aaron Hunt.  He is now a friend of Brandon's.  He's the man who adopted Brandon's son,

Abe.  About Brandon, he said, "I believe Brandon is on the precipice of finishing his life well.  He has grown tremendously. He has matured from a young man who blames others for his plights to a grown man who accepts responsibility for his decisions and is working hard to right his wrongs."

You also received a couple of letters from his wife, Elizabeth Goodan, and from his mother, Stephanie Jones.  They are both here in the courtroom today in support of Brandon.

Your Honor, each of their letters tell you about his strong work ethic, the improvements that he was making in his life, the positive steps that he was taking, but they also contain corroboration about the issues that he was having while at the halfway house.

As far as how we got here, Your Honor, we did file a sentencing memorandum docketed at No. 32 which explains the circumstances leading up to his choice to leave the halfway house.  I won't belabor those because I know that the Court has read that document.

THE COURT:  I have.

MS. GUNTER:  However, I did learn yesterday that I did make an error in that sentencing memorandum that I need to correct.

THE COURT:  Okay.

MS. GUNTER:  I said that when Brandon left the halfway house, he went to his mother's house.  He actually went to his --

to Elizabeth's house.  She was his fiancée' at the time, now his wife, but that was the address that those e-mails show he had been approved to live at.  So we knew the halfway house -- He knew that the halfway house had that address and knew that that was where he could be located.

THE COURT:  Okay.

MS. GUNTER:  Brandon and I have talked extensively about his future plans.  First, he wants to get home and build a life with Elizabeth and her five-year-old son, Jackson.  The PSR talks about him a little bit but Elizabeth talked about Jackson in her letter.  Jackson's dad is not in the picture and hasn't been for a while.  And so Brandon wants to fill that void for him.

He wants to be a dad to Jackson to teach him that bad choices have consequences and to guide him to a different path than Brandon chose, to be a father figure to him and to build a future for him.

He wants to be able to be in the life of his son, Abe, as well.  Abe is struggling with Brandon being away, and Abe needs Brandon in his life and Brandon needs Abe in his.

He's dedicated to his sobriety.  He knows he will have to be sober and clean to achieve all of his goals.  In addition, he has to be clean and sober to be around Abe, so it provides him an additional incentive.

Regarding his mental health, as I said earlier, he

recognizes the importance of mental health meds and treatment, and he desires to stay on those meds.  Because he has now experienced life with meds, he always wants to have access to his medications and mental health help.

Brandon has repeatedly expressed to me how tired he is at 30 years old.  He is done with all of this.  He's too young to be this tired.

His future is simple, not extravagant.  All he wants is to be a productive member of society.  The idea of him being a regular Schmo who pays his bills is exciting to him.  He just wants to know what it's like to be normal.

He wants his family to be proud of the fact that he turned his life around after getting out, and he just wants to see his family happy.  He will do whatever he has to to stay out there and show his family that he's not a bad person.  In his words, "I just got stuck in a rut and I'm now climbing out of it."

Your Honor, the Government has recommended a sentence at the low end of the advisory guideline range.  For all of the reasons stated here today and in Documents No. 29 and 32, we do request a sentence at the low end of the guideline range.  The PSR left open the possibility of a fine.  I would request that the Court not impose a fine.

THE COURT:  That's granted.

MS. GUNTER:  Thank you, Your Honor.

10

With regard to facility options, in doing an estimation of what I think Brandon's security classification might be, he's one of those that could be a medium, could be a high.  So we would request a recommendation for FCI Three Rivers if he is determined to be a medium security.

THE COURT:  That's granted.

MS. GUNTER:  Thank you, Your Honor.  And if he's determined to be a high security, he is requesting a recommendation for placement at USP Tucson.

THE COURT:  That's also granted.

MS. GUNTER:  Thank you, Your Honor.

Additionally, he is requesting a recommendation for access to drug treatment and mental health treatment while serving his sentence.

THE COURT:  That is also granted, but I will not lengthen his term of imprisonment to promote rehabilitation.

Okay, Mr. Goodan.  You have the right to tell me anything you would like to tell me.  You do not have to say anything if you don't want to.  I won't hold it against you if you don't, but it is your right.

Is there anything you'd like to say?

THE DEFENDANT:  Yes, sir.

THE COURT:  Go ahead.

THE DEFENDANT:  I would like to take this time to say that I take full responsibility for my actions.  I also want to

say that I apologize to my family and loved ones.  I feel as though my actions will inflict more of a hardship or punishment on them than I may even have to or than they even have or will on myself.

I realize that my choices or that the choices that I have made have negatively affected and even hurt the people that I love.  And for that, I want to tell my wife, my mother, my friend Aaron Hunt that I am sorry.

I will take this time to continue to grow, mature to be the husband, father, son and friend you all deserve.

Thank you.

THE COURT:  All right.  Ms. Howey?

MS. HOWEY:  Yes, Your Honor.  Based on the reasons stated in the Government's sentencing memorandum, the Government agrees that a sentence of 15 months would be appropriate.

THE COURT:  Okay.  I agree that a sentence at the low end or below is also appropriate.

You're going to face some time because you walked away.  To walk away, escape, nevertheless it's an escape.

I understand the mitigating circumstance and why and the halfway house was, you know, stressful.

And, Ms. Gunter, I'm sure, given the relatively short length of the sentence, he's going to be right back at a halfway house.  Have you spoken with him about that?  If you can't tell me that, that's fine.  But why will this time be different?

Because I don't dispute -- I'm sure a halfway house is not the best place to live.  I'm sure some are better than others.  I'm sure the people that you live with, some are better than others.  But, you know, why is this time going to be different?  Is there anything we can do to -- to make this time different?

Because it appears to me this is an unusual case.  It's an odd case.  I have recognized and my sentence will reflect what's in the parties' filings in this case, but you're going to -- I'm sure you're going to go back to a halfway house.  And are you going to be able to deal with it and not walk away again or start using drugs again?

MS. GUNTER:  Your Honor, we -- we have talked about that.  I was of the opinion that there's no way they would send him back to a halfway house but if they do, I ---

THE COURT:  I'm sorry.  Say that again.  You don't think they will?

MS. GUNTER:  I would be surprised if they do.

THE COURT:  Because he's escaped.

MS. GUNTER:  Yes.

THE COURT:  So he -- In your view, he likely will serve incarceration until he's done and then be released.

MS. GUNTER:  That's my expectation.  I hope not, but that's kind of what my gut says.  But we have talked about the halfway house.  And because of the fact that he now recognizes

the dire consequences of leaving the halfway house, I'm not concerned about whether he would leave a halfway house again.

THE COURT:  Would you have an objection to me recommending -- I never made this recommendation; I don't know if the BOP would take it -- that he not be placed in a halfway house?

Which would keep him incarcerated but would avoid the potential of this situation happening again.  I can -- I can include that in the judgment.

MS. GUNTER:  Everything in me, as his defense lawyer, says I want him out as soon as possible.

THE COURT:  Why don't you take a second and talk with your client about it.  I'm not trying to lean on you.  It's an honest question.  If -- If it ironically would increase the chance of success, which is counter-intuitive, but in this circumstance -- Why don't you just take a second.  I'm open to either way.

MS. GUNTER:  Well -- And, Your Honor, just -- just so the record is clear, I don't -- I don't feel like you're weighing on me.  My inclination is to reject that request, but let me talk to him first.

THE COURT:  Sure.

(Pause)

MS. GUNTER:  Your Honor, he -- he appreciates the consideration from the Court, but if they're willing to give him

another shot at a halfway house, he would appreciate that opportunity. So we would request that you not make that recommendation.

THE COURT: Okay. I won't.

MS. GUNTER: But as far as to answer your question, a lot of the impetus behind him leaving was the thought that he would just be returned to the BOP to complete his sentence, not accrue an additional charge.

With that bank of knowledge now, I think that that would also aid him in making better decisions. He also knows of the importance of his mental health medication in helping him make better decisions. He's got the support system in place, Your Honor. And so I am not concerned about repeat behavior from Brandon. When he tells me over and over and over again that he's done with this, I genuinely believe him.

THE COURT: Okay. All right. Thank you.

All right. I won't include that in my judgment.

But, Mr. Goodan, I'm just going to be upfront with you. If -- If they do put you in a halfway house and you do walk away again, it's -- it's going to look awful, right?

THE DEFENDANT: Yes, sir.

THE COURT: I mean it doesn't take -- You don't have to be a judge or a lawyer to understand that. Just the optics of that, if you do this again. So just assume, if they put you in a halfway house, that it's going to be hard, you know.

THE DEFENDANT:  Yes, sir.

THE COURT:  It's not going to be fun.

THE DEFENDANT:  Yes, sir.

THE COURT:  It's probably not supposed to be.  And if you do it again, I'm certainly going to remember this day.  Okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.

All right.  Ms. Gunter, just because we've gone out of order, you've said everything you wanted to say.  Your client has said everything he wanted to say, correct?

MS. GUNTER:  Yes.

THE COURT:  All right.  I have carefully reviewed the PSR and the PSR Addendum.  I inform the Defendant that the Plea Agreement is finally accepted.  The judgment and sentence will be consistent with it.

I'm required by statute to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in Section 3553(a)(2) and to consider all the sentencing factors in that statute which I have done.

I've considered the nature and circumstances of your offense which we've now discussed at length.  Again, I have read all the documents in this case.

You might not have understood it to be an escape but it was.  You were ordered to be at Dismas Charities.  You walked

away.  Regardless of why or the extenuating circumstances, that was a violation.  I know you've accepted responsibility for that, and there have to be consequences for that.  No matter how hard something is, we don't get to just ignore our obligations and do what we want to do.

I've considered your history and characteristics as well which is a mixed bag.  On the one hand, you're a Category VI.  That's as high as we go.  There are some very concerning prior convictions in your past.  On the other hand, I do take note of your personal history and that -- I hope that your criminal conduct is decreasing in severity and not increasing.  I do see signs that you are ready to put this behind you.  I hope that's the case.  There are -- There are extenuating circumstances here.  You -- There's evidence before me that you were working hard to try to access your mental health medications and doing your best to get those.

So history and characteristics is a mixed bag.  I do recognize what your attorney has told me, that a lot of awful things happened to you as a child.  You are now -- Are you still 29 or are you 30 now?

THE DEFENDANT:  I'm 29, sir.

THE COURT:  You're now a full-grown man and what happened to you as a child is not your fault.  It's not, but it is your problem.

THE DEFENDANT:  Yes, sir.

THE COURT: And that's not fair, but nobody said life was fair. So it's on you to -- to deal with that and to find a way to cope with it in a way that doesn't lead you to podiums like that. I wish you the best in doing that.

I've considered all the remaining 3553(a) factors as well. And in light of everything that's before me, especially the extenuating circumstances of the Defendant's unsuccessful attempts to access his mental health medications, what's before me in Document No. 29 as well, I don't think a sentence within the advisory guideline range would be reasonable here. So I'm going to impose a downward variance to a sentence of 12 months and one day. I find that to be sufficient, but not greater than necessary.

I believe that the guideline calculations announced were correct, but to the extent they were incorrectly calculated, I would have imposed the same sentence without regard to that range, and I would have done so for the same reasons in light of the 3553(a) factors.

The sentence is going to run consecutively to any sentence imposed in -- any remaining sentence imposed in Case 2:16-CR-061-3 which is pending in the Amarillo Division of this district. So what that means is you've got to finish your time on your other case --

THE DEFENDANT: Yes, sir.

THE COURT: -- in addition to your time in this case.

I don't know how much time is left.

Do you, Ms. Gunter?

MS. GUNTER:  I believe he satisfied that sentence on January 6th.

THE COURT:  Okay.

MS. GUNTER:  So this back time should be applied to that.

THE COURT:  All right.  So if that's satisfied, great. If not, this sentence is going to run consecutively with that one.

Upon release from imprisonment, you're going to be on supervised release for a term of three years.

While on release, you shall comply with your Mandatory Conditions of Release listed in your Presentence Report and in Section 3583(d).

Ms. Gunter, did you and your client receive and discuss my "Written Notice of Intent to Impose the Standard and Special Conditions"?

MS. GUNTER:  Yes, Your Honor, we did.  We received it, reviewed it, signed it.  It has been filed back with the Court. I would request that the Court consider reducing the co-payments for Mr. Goodan.  Apart from that request, we have no objections to the conditions.

THE COURT:  Reduced to just -- Reduced to any amount?

MS. GUNTER:  Any reduction would be appreciated,

Your Honor.

THE COURT:  It's important for me that people have skin in the game in these programs.  I don't impose the copayment for -- for no reason.  I will reduce it to $20 per month each. So those -- That objection is granted.  Both will be reduced from 25 to 20 per month.

MS. GUNTER:  Thank you, Your Honor.

THE COURT:  If you have difficulty making those copayments for some reason, tell your probation officer and that can be adjusted.  But, otherwise, it is important that you be invested in those programs, literally monetarily invested as well.

Hearing no objections, those conditions are adopted today.  They will be included in my judgment.  I find that they are reasonable and relate to all of the appropriate statutory considerations, and they impose no greater deprivation of liberty than reasonably necessary under the statute.

I'm waiving a fine.

You must pay the Mandatory Special Assessment of $100, due and payable immediately.

I have recommended substance abuse and mental health treatment while incarcerated.

Sir, about supervised release, you know, I've been told that you had some confusion about what it meant to walk away from Dismas Charities.  Let me leave you no doubt.  If you violate

your conditions of supervised release when you get out, I have the right and option to send you back to jail, --

THE DEFENDANT: Yes, sir.

THE COURT: -- even if it's not a new crime. I do not want to do that, but I will not hesitate. Okay?

You've been afforded a measure of mercy today. I believe you're ready to turn it around. I'm not fussing at you. I'm just giving you fair notice. If you violate your conditions, our probation officers are great. They always find out. Our Marshals always find people. You will be caught.

THE DEFENDANT: Yes, sir.

THE COURT: Those conditions are there to help you. They're not there to trip you up. But if you violate them, I will remember this day, and it will be a serious violation of trust that's been placed in you.

Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You have the right to appeal your conviction and your sentence. If you'd like to appeal, you need to file a Notice of Appeal within 14 days of today in this court. If you want to do that, just tell your attorney. She can get that done for you. She can also ask that the cost of the appeal go to the United States and not to you.

Do you understand those rights?

THE DEFENDANT: Yes, sir.

THE COURT:  Ms. Gunter, anything further from the Defense?

MS. GUNTER:  Just one thing, Your Honor.  He still has to serve the term of supervised release for the Amarillo case, and so I would ask that the Court order that the two terms of supervised release run concurrently.  And, again, that cause number was 2:16-CR-061.

THE COURT:  That's granted.

MS. GUNTER:  Thank you, Your Honor.

THE COURT:  Anything else from the United States?

MS. HOWEY:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Mr. Goodan, at this time you are remanded to the custody of the United States Marshal, and I wish you good luck, sir.

THE DEFENDANT:  Thank you, sir.

(Hearing adjourned at 11:16 AM.)

CERTIFICATE OF OFFICIAL REPORTER


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of August, 2024.


/s/ Deborah A. Kriegshauser

_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER