UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
                       ABILENE DIVISION


UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,        )
                                 )
     VS.                          ) No. 1:24-CR-025-H-BU-3
                                 ) No. 5:22-CR-058-H-BQ-1
BRANDON JOE GOODAN,               )
                                 )
                Defendant.        )
_____)


              PRELIMINARY HEARING and DETENTION HEARING
                 BEFORE THE HONORABLE JOHN R. PARKER
                  UNITED STATES MAGISTRATE JUDGE
                          JUNE 6, 2024
                          ABILENE, TEXAS


FOR THE PLAINTIFF:

     WHITNEY OHLHAUSEN
     UNITED STATES ATTORNEY'S OFFICE
     1205 Texas Avenue, Suite 700
     Lubbock, TX  79401
      (806) 472-7351


FOR THE DEFENDANT:

     KEVIN W. WILLHELM
     WILLHELM LAW FIRM
     P.O. Box 3536
     Abilene, TX  79604
      (325) 692-0900


     Proceedings recorded electronically; transcript produced by
computer-aided transcription.
_____

               DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                  Federal Official Court Reporter
                  1100 Commerce Street, 15th Floor
                       Dallas, TX  75242
                        (214) 753-2325

(Proceedings commenced at 10:20 AM.)

THE COURT:  So the Court now calls Case No. 1:24-CR-025-3.  That's *United States of America versus Brandon Joe Goodan*.  The Court also calls Case No. 5:22-CR-058-1, *United States of America versus Brandon Joe Goodan.*

MS. OHLHAUSEN:  Good morning, Judge.  Whitney Ohlhausen on behalf of the United States, present and ready.

THE COURT:  Thank you.

MR. WILLHELM:  May it please the Court.  Kevin Willhelm present on behalf of Mr. Goodan.  We are ready to proceed.

THE COURT:  Thank you, Mr. Willhelm and Ms. Ohlhausen.

So we had a brief discussion off the record before we started about combining the hearings on both of these cases, the Abilene case and the Lubbock case.  And, of course, we'll make sure that the dockets have the appropriate minute entries and documents filed in there.

So if there's no objection from either party, we'll combine the Preliminary Hearing and the Detention Hearing in both cases.

Any objection from the Government?

MS. OHLHAUSEN:  No, Judge.

THE COURT:  Mr. Willhelm?

MR. WILLHELM:  No objection, Your Honor.

THE COURT:  All right.

So, Mr. Goodan, as I explained to you, I think it was

last week or maybe earlier this week, I can't remember, but you are entitled to this Preliminary Hearing first. And this is a hearing where the Government is required to establish probable cause or a fair probability to believe you violated your conditions as alleged.

And then you also are entitled to a Detention Hearing. Now the Detention Hearing in this case is a little different than the Detention Hearing in most criminal cases. In most criminal cases the burden is on the Government to establish that there is, you know, some flight risk or danger or it's not reasonable for the Court to set conditions that will assure your appearance and the safety of the community. In this case, because this is a revocation proceeding, the burden is on you, and it's a high burden. The burden is to show by what's called "clear and convincing evidence" that you won't flee or pose a danger, if released, pending your Final Revocation Hearing, assuming that I find probable cause. "Clear and convincing evidence" is a heavy burden. It's the -- Whatever it is, it's enough evidence to -- it's so weighty and convincing to enable me to immediately come to a decision without hesitancy. So it's a heavy burden. But, again, you're entitled to a hearing on that.

So typically the Government goes first and will go for first on the Preliminary Hearing, anyway, because they have the burden on that, but you have the burden on the Detention Hearing.

I'm assuming that both parties will want to present all

the evidence together with regard to not just the Lubbock and Abilene case but with regard to the Preliminary Hearings and the Detention Hearing.

MS. OHLHAUSEN:  That's what the Government would ask for, Judge.

THE COURT:  Any objection?

MR. WILLHELM:  No objection, Your Honor.

THE COURT:  All right.  You may proceed, Ms. Ohlhausen.

MS. OHLHAUSEN:  I first would just ask that the Court take into consideration the Pretrial Services Report for the purpose of this hearing.

THE COURT:  Any objection?

MR. WILLHELM:  No objection.

THE COURT:  All right.  The Court will take into consideration the Pretrial Services Report in both cases.

MS. OHLHAUSEN:  Okay.  And then I would call Officer Martin Hernandez to the stand, please.

THE COURT:  Do you solemnly swear or affirm under penalty of perjury that the testimony you will give today before this Court is the truth?

THE DEFENDANT:  Yes, sir.

THE COURT:  Thank you.  Be seated.

You may start when he gets settled.

MS. OHLHAUSEN:  Thank you, Judge.

                        DIRECT EXAMINATION

QUESTIONS BY MS. OHLHAUSEN:

Q.    Would you state your name for the record?

A.    Martin Hernandez.

Q.    And do you supervise Mr. Brandon Goodan?

A.    Yes, ma'am, I do.

Q.    Do you see him in the courtroom today?

A.    I do.

Q.    Would you point him out so I can make a record of that?

A.    Yes.  He's seated at the defendant table in the khaki-colored jumpsuit.

        MS. OHLHAUSEN:  Judge, if the record could reflect he has identified the Defendant.

        THE COURT:  The record so reflects.

Q    (By Ms. Ohlhausen) Let's go through some of Mr. Goodan's criminal history that's contained in the Pretrial Services Report.

        He has a theft from 2010.  Can you explain to the Court some of the noncompliance and circumstances related to him violating his probation after that?

A.    Sure.  So in 2010 he has a theft, more than 1500 to 20,000. In 2011 he pleaded "guilty" and was sentenced to three years' probation.  His probation in May of 2011 was extended to one year.

        In March of 2012, Probation amended to include substance

abuse, felony punishment facility.

In February of 2013, a motion to revoke his file. In August of 2013, probation was revoked and he was sentenced to 16 months' incarceration. And according to the court records, the Defendant was noncompliant with conditions of probation with the following particulars: Using methamphetamine, not paying probation fees, not paying court cost fees, not submitting to urinalysis, not paying for drug tests, not successfully completing the SAFPF Transitional Treatment Center, and not completing SAFPF continuing with care treatment plan and not reporting.

Q.   Okay. And then -- So in the same year in 2010 and in 2011 he has a conviction for Failure to Identify a Fugitive From Justice out of Donley County, Texas. Is that right?

A.   Yes, that's correct.

Q.   And then it looks like he was arrested in a different state. So that was in Missouri in 2011. He was arrested as a fugitive out of state and he was surrendered back to our state.

Is that your understanding as well?

A.   Yes, that's my understanding.

THE COURT: Let me ask something there. I'm sorry to interrupt the flow. I think I misspoke or maybe misunderstand. I may have said -- I may have thought you said that you wanted me to consider the Pretrial Services Report.

MS. OHLHAUSEN: Yes, sir.

THE COURT: Okay. So you're not talking about the

Petition for Person Under Supervision?

MS. OHLHAUSEN:  Sir?

THE COURT:  You're not talking about the "Petition for a Person Under Supervision" or are you talking about the Pretrial Services Report?

MS. OHLHAUSEN:  The Pretrial Services Report.

THE COURT:  I'm just wondering now whether I have a copy of that.

MS. OHLHAUSEN:  Oh.

THE COURT:  I may have.  Let me just double-check.  I'm sure it's in the file.

MS. OHLHAUSEN:  I do have a copy, and it's Docket No. 25.

THE COURT:  All right.  I can find it if you give me a docket number.

MS. OHLHAUSEN:  Yes, sir.

THE COURT:  Okay.  Is it 25 in both cases or just the Abilene case?

MS. OHLHAUSEN:  I'm looking at the 5.  So I guess it would be the Lubbock case, the 5:22.

THE COURT:  Let me just pull that up because I misunderstood.  I thought it was ---

MS. OHLHAUSEN:  And I'm sorry.  This is the report that I received from Mr. Hernandez.

THE COURT:  Let's do this because I'm not seeing it on

the docket.  I'm trying to find it here.  So if you have ---

MS. OHLHAUSEN:  I do have a copy, Judge.  And I'm sorry.  Because there are multiple cases, there are several filed, but this is the most recent that I got from Mr. Hernandez.

May I approach, Judge?

THE COURT:  You may.  Let's do this:  Can we -- I don't think we need to mark it.  It's up to you, but I will just consider it for purposes -- the limited purposes of this hearing and then we'll be done with it.

MS. OHLHAUSEN:  Yes, sir.  And I was just going through a little bit of that criminal history in there.

THE COURT:  I apologize for interrupting.

MS. OHLHAUSEN:  No.  It's 24 pages.  I was just highlighting some things as it relates to flight.

Q    (By Ms. Ohlhausen) So just that he was arrested out of state in 2011.  We arrested him as a fugitive in Missouri, and he was surrendered to our state.  Is that right?

A.    That's what I understand.

Q.    Okay.  And then in 2013, a couple years later, it was a conviction for Failure to Identify.  What were the facts -- just the facts, not the conviction -- around that?

A.    Okay.  According to the police report on June 26, 2013, the police were conducting surveillance on the Defendant to attempt to serve a federal warrant.  Officers eventually made entry into the residence and located the Defendant who advised officers his

name was "Eric Cyranoski."  They found the Defendant to be in possession of Eric Cyranoski's identification card, insurance card, and pharmacy discount card.

Q.    And then in 2015 it looks like he was convicted for Evading Arrest or Detention With a Vehicle.  What were the facts surrounding that?

A.    According to the police report, on May 11th, 2015, police responded to a call regarding an accident, somebody possibly being in danger.  When officers arrived, they observed a pickup pulling out of the backyard of the residence.  As officers attempted to pull the Defendant over, he fled, causing a vehicle pursuit.  The Defendant ran "YIELD" signs and traveled the wrong direction on an interstate.  Due to the dangerousness, officers ended the pursuit.  Witnesses saw the Defendant and a white female exit the truck with a young child and run into a trailer park.  The Defendant, Emerald Blunt, and a three-year-old child were found nearby.  At the time the Defendant was released pending further investigation.  He was arrested on the warrant on June 30th, 2015.

     And according to medical records from a Texas Department of Criminal Justice, the Defendant was treated on October 10th, 2017, after using a substance suspected to be synthetic marijuana.

Q.    Okay.  And I guess I should have been following along.  This is on Page 9 of the Presentence Report.  Is that right?

A.    Yes, ma'am.

Q.    Okay.  And then onto the next page and into Page 10, he has a burglary of a residence from 2015 conviction, right?

A.    That's correct.

Q.    And several other drug charges.

What is the conviction in 2016, the Failure to Appear?  It's on Page 10.

A.    On Page 10, February 2nd, 2016, was Abandon and Endanger a Child.

Q.    Okay.  And then what were those facts surrounding that?

A.    Let's see.  The original offense occurred with a separate case.  A warrant was issued on February 1st of 2016.  Officers went to the Defendant's residence and attempted to arrest him on the warrant.  However, the Defendant refused to leave the residence.  Eventually the Defendant exited the residence and he was arrested.  Officers noticed the smell of burnt marijuana emitting from the home, so a search warrant was executed. Officers recovered a marijuana bong, a marijuana pipe, a container with trace amounts of marijuana, and a set of plastic knuckles from inside the residence.

Q.    And then was there a subsequent conviction for bail jumping after they arrested him on that --

A.    Yes.

Q.    -- account?

A.    That was on May 6th, 2016, Bail Jumping and Failure to

Appear on a Felony.

Q.   Okay.  And those were convictions.

A.   Correct.

Q.   And then -- So when we get to the federal cases, what was his original conviction in 2017?

A.   His original conviction in 2017 was Unlawful Use of a Communications Facility.

Q.   And so your understanding of looking at that is that it involved some drugs or some drug dealing.

A.   That's correct.

Q.   And he was sentenced to four years' incarceration.

A.   Yes.

Q.   Okay.  And then in 2023 we see a second federal case.  He was sentenced to -- I'm sorry.  He was convicted of Escape from Federal Custody.  Can you explain to the Court the circumstances surrounding that?

A.   Yes.  On March 27th, 2017, Goodan was sentenced to 48 months' federal custody in a Case No. 2:16-CR-0061-D-03 out of the Northern District of Texas, Amarillo Division.  He was transferred to Dismas Charities Federal Halfway House on March 1st, 2022, to complete his federal sentence which was set to expire on January 6th, 2023.

On June 11th, 2022, around 1:00 PM, residents observed him packing his belongings in his dorm at Dismas Charities.  During a head count at 3:28 PM, the Defendant was not present.  Staff

conducted a search of the facility and were unable to locate the Defendant.  A review of camera footage revealed the Defendant left by walking out the front entrance.  Goodan did not have permission to leave Dismas Charities.  Consequently, a warrant was issued for his arrest.

Then on June 15th, 2022, Goodan was arrested on the warrant for these federal crimes.

Q.   Okay.  And so -- So that we better understand that, he was still in BOP custody, right?

He had not began his supervised release for his original charge.  Is that right?

A.   That's correct.

Q.   Okay.  And so while he's still in BOP custody, they release him to this halfway house, and he doesn't stay there.  He leaves, so they filed the escape --

A.   Correct.

Q.   -- charge.

Okay.  And he was convicted of that.  When did he begin his supervised release on both cases?

A.   He began on November 14th of 2023.

Q.   Okay.  And so that's been about six months or so.

And so tell us of the violations since he's been released, if there are any.

A.   Since his release, he tested positive for marijuana on multiple dates.  So we have May 3rd, 2024.  He verbally admitted

to me and also in writing on December 6th, 2023, that he used THC on November 23rd, 2023.

He has a positive for marijuana on January 9th of 2024, a positive on April 9th of 2024.

He signed an admission to marijuana use on March 7th, 2024, for use on February 20th, 2024.

On May 3rd, 2024, he signed an admission of drug use for THC around January 9th of 2024.  Additionally on May 3rd, 2024.  He signed an admission of drug use for THCs on April 26th of 2024.

And there was a string of diluted UAs which were attempting to falsify the records of the UAs.

Q.    Okay.  And did you provide a copy to me of those drug screens and then a list of the diluted UAs?

A.    Yes, ma'am.

Q.    Okay.

MS. OHLHAUSEN:  Judge, at this time I would move to introduce Government Exhibit No. 1 or I did mark it for identification purposes as Government Exhibit 1.

I have provided Mr. Willhelm a copy of it.

Does Your Honor have a copy?

THE COURT:  I do.  Thank you.

And, Mr. Willhelm, any objections?

MR. WILLHELM:  No, Your Honor.

THE COURT:  Government Exhibit 1 is admitted.

MS. OHLHAUSEN:  May I approach, Judge?

THE COURT:  You may.

Q    (By Ms. Ohlhausen) Do you have a copy?

A.    Yes, ma'am, I do.

Q.    Okay.  So I just want to kind of go through the last --
These are all the positive drug screens, and then you can see on
some of them at the bottom the outcome will show "diluted,"
right, --

A.    Yes.

Q.    -- on some of them?

And so you made a list on the very last page of all the
diluted UAs that he had.  So it looks like there are four dates
that showed he had diluted his samples.  Is that right?

A.    Yes, ma'am.

Q.    And so what does that mean if you can explain that to the
Court?

A.    It's my understanding a diluted UA is where the test subject
has been consuming large quantities of water to attempt to pass
the water through the system so it doesn't have an opportunity to
collect, I guess, what would show positive for any drugs.  So the
urine comes out essentially as water as opposed to more urine.

Q.    Okay.  And did you talk to him about trying to falsify these
specimens?

A.    Yes, ma'am I did.

Q.    And what -- what did he say about that?

A.    Originally, he had told me that he just drinks a lot of

water because he works outside a lot.

He then told me that he heard or spoke with his doctor and that it could possibly be a thyroid issue is the reason that his urine doesn't come out with some color as I tried to tell him. We need a little bit of tint to it. He just told me he just drinks a lot of water.

Q. Okay. And so did he ever admit to you that he did purposely dilute it or he just gave other excuses for it?

A. So after he had some more positive UAs, I spoke with him, and I specifically stated, "So these last UAs that we have been talking about that are diluted, you were actually attempting to falsify?" And he said, "Yes."

Q. Okay.

MS. OHLHAUSEN: I have no other questions, Judge.

THE COURT: Thank you, Ms. Ohlhausen.

Mr. Willhelm, any Cross?

MR. WILLHELM: Yes, Your Honor. Thank you.

CROSS EXAMINATION

QUESTIONS BY MR. WILLHELM:

Q. Good morning, Mr. Hernandez.

A. Good morning.

Q. You know, there was -- there was discussion about these state court cases, you know, starting more than ten years ago, nine years ago, eight years ago. All of those state court cases have been satisfied, right?

A.    Yes, sir, I believe that's true.

Q.    Okay.  And, you know, with the last one being 2016 which is eight -- eight years ago, correct?

A.    Yes, sir, that would be the -- My notes on the time, --

Q.    Yeah.

A.    -- that was for the Bail Jumping and Failure to Appear, yes, sir.

Q.    Correct.  Okay.  Since Mr. Goodan has been out on supervised release with you, he's -- he's maintained constant contact with you.

A.    Yes, sir.

Q.    I mean he's reported.  He's -- He's -- He's done what he's supposed to do in that regard.

A.    Correct.

Q.    Okay.  In fact, I've got a whole slew of text messages where he's talking to you all the time.

A.    Yes, sir.

Q.    Okay.  And even when you made him aware that the revocation was coming, he didn't flee or fail to report.

A.    Correct.

Q.    I mean he actually showed up and followed through.

A.    Yes, sir.

Q.    And after the last positive drug test, he's had -- he's had four more drug tests.  Is that correct?

A.    The last one was this year.  I don't have those records with

me, but there were a few more urine tests that were taken, yeah.

Q.   I mean does he test once a week?

A.   Generally, yes, unless I had court or we had arranged it again.

Q.   And those were all negative.

A.   I don't have those records.  I believe there was one more that resulted in a positive.  And then after that -- You know, I don't have my records with me, but I do believe after that there was a negative.

Q.   Okay.  And do you know Mr. Goodan's job?  What job he was working?

A.   I believe it was a pool company.  I don't have that part written down.  I'm sorry.

Q.   That's fine.  He worked for Precision Turf Management.  Is that correct?

A.   That sounds correct.

Q.   Okay.  And -- So that is outside work.

A.   Correct.

Q.   So I mean outside in the heat, you're going to drink a lot of water, anyway; right?

A.   Yes.

Q.   Okay.  And Mr. Goodan has a -- He's -- He's married.  He has a wife.

A.   I'm sorry.  I didn't hear you.

Q.   Mr. Goodan has a wife, correct?

A.    Yes.

Q.    Okay.  And you're familiar with her?

A.    A little bit.  I'm not sure of the actual -- if they're legally married or common law, but, yes, he's spoken about her previously.

Q.    And -- And I notice in your report that you indicated that he had not wanted to do inpatient treatment but he was doing outpatient treatment or was working with outpatient treatment.  Is that correct?

A.    Correct.

Q.    And he even had started with Betty Hardwick.  Is that right?

A.    Yes, sir.

Q.    Are you familiar with -- with his treatment with Betty Hardwick at all?

A.    Yes.  I had received some e-mails stating that he had started attending treatment with their -- their -- what you call agency or facility.

Q.    Yeah.  Did -- Did they provide you with any diagnoses or any issues with regard to him and his treatment there?

A.    I don't recall receiving what the diagnosis was.

Q.    Okay.  All right.  And at some point he was -- he was -- Did he -- He got accepted at Serenity House as well.  Is that correct?

A.    So I had received a text from him stating that he was talking with Serenity but that he was not admitted at that time

but it was coming soon.  And at that point the process for the revocation proceedings had already started.

Q.   Okay.  So on May the 6th, did he text you that he had actually been accepted and they wanted him to turn himself in on Wednesday?

A.   That sounds about right from what I recall but I don't remember.  I don't have the text with me, but I do remember him saying that he was speaking with Serenity, and it was around that timeframe.

Q.   Okay.  And then he continued to report.  In fact, you asked him to move his May 13 report to -- to the next Tuesday.  Is that ---

A.   Yes, it was.  That sounds correct.

Q.   Okay.  And then on May the 20th, you asked him to move -- to come in on Wednesday because you had court.

A.   That sounds right.

Q.   Okay.  And he reported during that timeframe.

A.   Yes, sir.

Q.   And other than the marijuana use, he's complied with his supervised release.

A.   And to include the diluted UAs.  Other than that, yes, sir.

Q.   Yeah.  Thank you.

        MR. WILLHELM:  I pass the witness.

        THE COURT:  Thank you.

        Any Redirect?

MS. OHLHAUSEN:  No, Judge.  Thank you.

THE COURT:  All right.  You may step down.  Thank you.

Any further evidence?

MS. OHLHAUSEN:  No, Judge.  I rest at this time.

THE COURT:  Mr. Willhelm, do you have any evidence to proffer?

MR. WILLHELM:  Yes, Your Honor.  I have a little bit of both.  I'd like to call Brian Demmitt to the stand.

THE COURT:  Mr. Demmitt.

Mr. Demmitt, raise your right hand.  Please stand.  Do you solemnly swear or affirm under penalty of perjury that the testimony you will give today before this Court is the truth?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  Be seated.

DIRECT EXAMINATION

QUESTIONS BY MR. WILLHELM:

Q.   And, Mr. Demmitt, for the record, could you state your name for the Court?

A.   Yes, sir.  My name is Brian Demmitt.  I work for Betty Hardwick Center.

Q.   And what is your occupation with Betty Hardwick?

A.   I'm a Licensed Chemical Dependency Counselor.

Q.   Okay.  And have you had an opportunity to evaluate and treat Mr. Goodan?

A.   Yes, sir, I have.

Q.   Okay.  And when did you begin working with Mr. Goodan?

A.   In April he came in.  He was referred to us by his probation officer.

Q.   Okay.

A.   And we did -- Our initial assessment we did in April.

Q.   Okay.  And since then, what has been the -- Well, were you able to diagnose Mr. Goodan with any ---

A.   In our -- In our assessment, he disclosed that he had been diagnosed with General Anxiety Disorder, Major Depressive Disorder and PTSD.

Q.   Okay.

A.   He grew up in an abusive home.  He had six different living situations growing up and was in foster care briefly.  And he's dealing with some emotional trauma that we were going to address.  He's back on his meds for anxiety and depression.

Q.   And so at the time that he was evaluated and you began treating him, he wasn't on any medication.

A.   No, sir.

Q.   So he was -- he was self-medicating.

A.   Yes, sir.

Q.   With the marijuana.

A.   Yes, sir.

Q.   And he -- Did he admit that to you?

A.   Yes, sir, he did.

Q.   Okay.  And if Mr. Goodan is released on bond, bail, during

the pendency of this case or cases, would he able to continue his treatment with you guys?

A.    Absolutely.

Q.    Okay.  And do you believe that would be in his best interest?

A.    I do, yes.

Q.    And do you think, in your opinion, that Mr. Goodan would cooperate and continue along that path?

A.    Yes, sir.

Q.    Okay.  You don't have any reason to believe that he would be a flight risk or -- or -- or ---

A.    I do not.  He was -- The brief time that we had him, he was engaged, participated well, and was enthusiastic about it.  But, you know, he's -- he had continued to use marijuana, too.  I believe he's medicating -- self-medicating his mental health disorders.

Q.    And so with proper medication, he wouldn't -- he wouldn't have any need for ---

A.    I think he would improve -- improve his situation dramatically.

Q.    Okay.  He wouldn't have any need for marijuana.

A.    There's no guarantees, but I think we would help him a great deal.

MR. WILLHELM:  Thank you.  I'll pass the witness.

THE COURT:  Thank you, Mr. Willhelm.

Ms. Ohlhausen?

MS. OHLHAUSEN:  Just a couple of questions.

CROSS EXAMINATION

QUESTIONS BY MS. OHLHAUSEN:

Q.   Just so that I know what kind of a treatment it is, is it inpatient that he's been in or was it outpatient?

A.   No, ma'am.  It's intensive outpatient.

Q.   Okay.  And so what are -- What's kind of like the schedule that he's been doing?

A.   He attends group from 6:00 to 8:00 twice a week.  Then we have ---

Q.   I'm sorry.  6:00 to 8:00 at night?

A.   Yes, ma'am.

Q.   Okay.

A.   Correct.  And then we have individual sessions twice a month or as needed.

Q.   Okay.  And I know -- I think you were sitting in the courtroom earlier, --

A.   Yes, ma'am.

Q.   -- correct?

And so I know that you said that you don't have any reason to believe he'd be a flight risk, but ---

A.   No, ma'am.

Q.   Right.  But in just the couple of weeks -- You did hear his history that he has convictions for "Failure to Appear" and "Bail

Jumping" and things like that, right?

A.   I did.

Q.   And that doesn't change your opinion, though?

A.   No, ma'am.

Q.   Why is that?

A.   I -- I believe he wants to get clean.  I believe he's sincere.

MS. OHLHAUSEN:  Okay.  I have no other questions, Judge.

THE COURT:  Thank you.

Any Redirect?

MR. WILLHELM:  No, Your Honor.  We'd call Elizabeth ---

THE COURT:  One second, please, before Mr. Demmitt sits down.

This is just to clarify the record.  I think it's obvious from this -- the date his supervision commenced, but you mentioned that you started treating him in April.  That's, obviously, April of this year?

THE WITNESS:  Yes, sir.  That's correct.

THE COURT:  All right.  You may step down.  Thank you.

MR. WILLHELM:  Sorry, Your Honor.

THE COURT:  That's fine.  Thank you, Mr. Willhelm.  You have another witness?

MR. WILLHELM:  Yes, Elizabeth Goodan.

THE COURT:  Ms. Goodan?

Ms. Goodan, do you solemnly swear or affirm under penalty of perjury the testimony you'll give today before this Court is the truth?

THE WITNESS:  Yes.

THE COURT:  Please be seated.

You may begin.

MR. WILLHELM:  Thank you, Your Honor.

DIRECT EXAMINATION

QUESTIONS BY MR. WILLHELM:

Q.   For the record, you are "Elizabeth Goodan"?

A.   Yes, sir.

Q.   And you're Brandon's wife?

A.   Yes, sir.

Q.   And do you guys have children together?

A.   I have a son and then I'm pregnant with -- I have a son with another person but I am pregnant with his child right now.

Q.   Okay.  And are you working?

A.   No, sir.

Q.   Been trying to find work?

A.   Desperately.

Q.   When are -- When are you due?

A.   August 25th.

Q.   Okay.  So Brandon, Mr. Goodan, was the sole provider for you guys.

A.   Yes, sir.

Q.   Okay.  And was he working regularly?

A.   Very regularly; more than 40 hours a week.

Q.   Okay.  And that was with Precision Turf Management?

A.   Yes, sir.

Q.   Okay.  And what did he do for Precision Turf Management?

A.   He builds custom pools and works with some like -- some landscaping and things of that nature.

Q.   So the name of the company is "Precision Turf Management" but they build pools as well as --

A.   They do a --

Q.   -- yardwork stuff.

A.   -- a variety of things including just landscaping and building pools and irrigation work.  They're working on changing their name to be a little bit more inclusive of everything that they do.

Q.   Got you.  Thank you.

Do you believe that -- And understanding today's hearings are based upon, you know, probable cause that he violated his conditions of supervised release, you understand that part?

A.   Yes.

Q.   And then also whether during the pendency of these cases that -- whether by clear and convincing evidence we can show that Mr. Goodan, Brandon, would not be a flight risk, that he would not do harm to himself or others, and that he would appear for court when he's supposed to appear for court, you understand

that?

A.   Yes, sir.

Q.   Okay.  Do you believe, knowing that there's a possibility his probation could get revoked, that Brandon would continue working, continue providing, continue -- if he was released and that he would continue to show up for -- continue to report and do everything he's supposed to do during the pendency of these cases?

A.   Yes, sir, I do believe that he will come back no matter what.  He will -- I don't believe he's going to try to run away.  We have a son coming and he does not want to miss that at all, and I know he wants to work, and I don't believe he's going to go anywhere.

Q.   Okay.  And as of right now, you got a place to live.

A.   Yes, but I did get a three-day notice to vacate on my door this morning because I do not have a job and I haven't been able to pay anything for rent this month.

Q.   Okay.  And -- But did you -- Brandon was paying the rent.

A.   Yes, sir.

Q.   Okay.  Since Brandon's been released, have you guys been together?

A.   The whole time.

Q.   Okay.  And y'all -- This is at least -- at least the second residence you've lived in.  Is that correct?

A.   Only the second, yes, sir.

Q.   Okay.  But -- I mean the Probation Department was aware of the move and where the change in residence is.

A.   (Affirmative gesture).

Q.   Okay.  And are you willing to help Brandon make sure that he gets to all his hearings, court, or even appointments with me?

A.   Yes, of course.

Q.   Okay.  Thank you.

     MR. WILLHELM:  I pass the witness.

     THE COURT:  Thank you.

     Any Cross?

     MS. OHLHAUSEN:  Just a couple of questions, Judge.

                    CROSS EXAMINATION

QUESTIONS BY MS. OHLHAUSEN:

Q.   You said that you were with him before he was released.  I know he had a couple of cases, so I just want to make sure I understand the timeframe.  Whenever he was still in BOP custody -- so I think you heard the testimony earlier -- and he left the halfway house, were you all together at that time?

A.   Yes, ma'am, we were.

Q.   Okay.  And so that was an escape from federal custody.  Did he come to your house?

A.   He came to my apartment, yes.

Q.   Okay.  And were you aware that he had a warrant for ---

     THE COURT:  Let me just ask you -- I mean I know that you all don't intend to prosecute her.

MS. OHLHAUSEN:  I don't, no, Judge.  And I'm sorry. I'm really just asking if she's aware of his escape and kind of if he's been around at that time.

THE COURT:  Okay.  Let me just do this:  You need to be aware that you have potentially the right not to make any statement about any potential criminal charges.  So with that said, you may continue.

Q    (By Ms. Ohlhausen) And so you all -- And I just wanted to establish:  You all were together at that time and he had -- he had come around.

And so now with these new violations, have you seen him smoking marijuana or been with him while he's been using those drugs?

A.    No, ma'am, I haven't.  I actually did not.  I wasn't completely aware.

Q.    Okay.  And so what do you mean not completely?

A.    I just -- I didn't know.  I didn't know.  That's all I'm saying.  I didn't know.

MS. OHLHAUSEN:  I have no other questions, Judge.

THE COURT:  All right.  Thank you.

Anything else of this witness, Mr. Willhelm?

MR. WILLHELM:  Just very briefly.

REDIRECT EXAMINATION

QUESTIONS BY MR. WILLHELM:

Q.    Elizabeth, you were asked about Brandon's escape.  When -- After he escaped, were you -- were you aware -- are you aware of whether or not he attempted to further flee or -- or if he just waited for the authorities to come get him?

A.    He did not attempt to further flee.  He -- He accepted his circumstances and he allowed them to arrest him.  He did not run.  Nothing bad happened.  And he -- When he went back to prison, he did his full stay and then he got out.  He went back to business and completed his entire supervision without any problems whatsoever.  He came home, finished his state, I guess, probation or parole.  He finished that and has been doing -- has not missed a single report for his federal PO since then.  Even when he knew that there was a possibility of him being arrested, he still came up here every single time, even in his work clothes.  He was totally prepared.

        MR. WILLHELM:  Thank you.

        No further questions.

        THE COURT:  Well, let me clarify something real quick.  I want to make sure I understand this because that -- that testimony, that last part, confused me a little bit.

        I know that he -- or I think I know that on June 11th of 2022, that's when he escaped from Dismas, correct?

        MR. WILLHELM:  Yes, sir.

        THE COURT:  He was sentenced for that offense on

January the 26th of 2023 for 12 months.  And then it was later that year, on November 14th of 2023 that he commenced his supervised release, correct?

MR. WILLHELM:  Yes.

THE COURT:  Ms. Ohlhausen, did you have anything further?

MS. OHLHAUSEN:  No, Your Honor.  Thank you.

THE COURT:  All right.  You may step down, ma'am.  Thank you.

MR. WILLHELM:  Your Honor, I have no further witnesses; just -- I mean I can provide proffer and closing argument in the same ---

THE COURT:  All right.  Well, let's do this:  Let me let Ms. Ohlhausen go first and then we'll come back.  Well, I'll tell you what, let's reverse that.  Mr. Willhelm, I'm going to let you go first and then I'll let you have the last word when Ms. Ohlhausen is done, given the detention issue.

MR. WILLHELM:  Thank you, Your Honor.

First, I have -- I have a letter from Mr. Goodan's supervisor at Precision Turf Management.  His name is Brian Smith.  He states that Mr. Goodan is a vital part of their team.  He comes to work every day on time.  He works every task that they ask of him.  He goes out of his way to learn things he doesn't know.  He's willing to come in and work whatever hours that's -- that's asked of him to get the job done.  He brings a

set of skills to the company that have expanded what they're able to do in-house, and he has a bright future with their company. Mr. Smith is ready, willing and able to put him back to work should he be released during the pendency of these cases.

And then his mother is also -- who's present in the courtroom, she is also very willing to make sure that her son complies with all the rules of supervision and release on bond and is willing to guarantee his cooperation with the Court.

I think this is an interesting case, and I know Mr. Goodan has a lot of history there with, you know, with the escapes and all that kind of good stuff. And that sounds like, "Oh, I wouldn't want to let him out," but I think there's a big shift after he was re-arrested and went and did his time on the new felony charge of escape from federal facility. And since that time, he has been a different person. He is -- He's been responsible. He's worked every day. He's reported every time he is supposed to report, even in the face of a revocation.

His last several drug tests have been clean, but he's also now getting treatment for his underlying root problems which are the anxiety and the PTSD, and he's getting medicated for that. And as such, he's not needing to self-medicate. He's enrolled in college, and he even -- he's even asked for inpatient treatment, if that's necessary.

But he's in a situation where it's vital to him to do everything right from this point forward, and I think he is a

good candidate for release.  And so I'm requesting the Court to release him pending the outcome of these cases.

THE COURT:  All right.  Thank you, Mr. Willhelm.

Ms. Ohlhausen?

MS. OHLHAUSEN:  Yes, Judge.

Just for the first part of it, which is that the Court -- I'm asking that the Court find probable cause; there's a violation.  I think the Court can find probable cause, that he's committed the violations, based on his admissions that he's violated the rules and then the testimony from Mr. Hernandez and then in Government's Exhibit No. 1.

THE COURT:  I do intend to find probable cause.

MS. OHLHAUSEN:  Yes, sir.

And so, Judge, we know he poses a flight risk because of his history of flight and his federal conviction for escaping.

I think the notion that he's just a completely different person now is just not the case.  When Judge Hendrix sentences defendants, I've heard him say at the last sentencing hearing, you know, "Probation is here to help you, and you can utilize their services.  They'll work with you.  They'll talk with you."

Mr. Hernandez was working with him from November until now with these positive drug screens, and he, from my understanding, did not say he has anxiety, needs treatment.  You know, "I need medication.  I'm only self-medicating."  You know,

nothing like that was said.  He just continued to test positive for drugs and violate his conditions and then lied about it and said that it was because he was drinking water, and then we heard from the testimony at the end that he did try and falsify those. And so I knows he's trying to get help now but it's, you know, he's been revoked.

But I think he does pose a flight risk based on his history.  He's kind of following the same pattern of using drugs and then he'll lie to law enforcement, lie to probation staff, and then he's fled law enforcement before and now fled his federal -- or he was in BOP custody.

So I'm asking that the Court detain him pending his Final Revocation Hearing.

THE COURT:  Thank you, Ms. Ohlhausen.

Mr. Willhelm, let's have the final record.

MR. WILLHELM:  Thank you.

Well, I disagree with Ms. Ohlhausen and her statements because he did ask for help from Mr. Hernandez.  He did seek treatment from -- for his condition and for his use.  I mean he did ultimately admit to everything.  And in the face of revocation, he didn't flee.  He didn't run.  He owned up to his responsibility and continued to report; provided clean urinalyses that were not diluted and showed that he was ready, willing and able to comply with everything that was required of him, and he's -- he continues to do that.  And ---

THE COURT:  When did that begin?  Because, you know, it's ---

MR. WILLHELM:  May the 3rd.

THE COURT:  May the 3rd.  This is like last month.

MR. WILLHELM:  Yes, sir.

THE COURT:  All right.

MR. WILLHELM:  And he had four subsequent drug tests after that that, you know -- If they -- If they had shown a positive, we would have had the reports on those.

THE COURT:  Right.  I'm willing to assume that, anyway. I don't know if it's true or not, but I'm willing to assume that.

MR. WILLHELM:  And -- So my point of this is:  In the face of adversity, rather than fleeing and rather than running, he said, "Here I am.  I'm going to do what's right.  I've got -- I've got a child on the way.  I've got to do what's right," and he's willing to continue to do that.

Thank you.

THE COURT:  All right.  Thank you, Mr. Willhelm.

Mr. Goodan, I have no doubt that, you know, you have the best intentions now.

And let me just do this first:  I do find, based on the evidence presented here today, that there is probable cause to believe that Mr. Brandon Joe Goodan violated the conditions as alleged in Case No. 1:24-CR-0025-3.  And similarly, I find, of course, that there's probable cause to believe that Brandon Joe

Goodan has violated his conditions as alleged in Case 5:22-CR-058-1.

Now on to the detention. And, again, as I mentioned at the beginning, this is a heavy burden on anyone. I think Mr. Willhelm has presented a very good case. And I was describing earlier the -- what it means to have this burden of clear and convincing evidence. That's not really defined anywhere, but the best I can come up with, looking at the decisions that have -- that reported that is that, again, it's so -- the evidence is so weighty that it compels the conclusion, without hesitation, that those facts are true. And the facts I'm talking about are the facts that I need to rely on to persuade me that you won't be a danger or a flight risk.

So -- And I'm willing to ignore your fairly extensive criminal history to a certain extent. I think that a lot of that just shows and most right now that you certainly are aware that there's consequences to breaking the rules. That much should be clear. Yet, the escape from Dismas happened a relatively short time ago. And then given the criminal history and given the walking away from Dismas and being sentenced to another year for that and supervised release begins on November the 14th, it appears, at least the evidence at least shows, that you immediately starting doing something you knew you shouldn't do, violating rules again. So -- And you were under court supervision at the time.

Now I get that you're asking for a second chance or third chance, whatever chance it is, but that's what the Court's probation officers are there for. They -- Mr. Hernandez appears to have given you multiple chances. He doesn't just act on his own out there. When these probation officers are interacting with you, they're interacting with you on behalf of the Court. That is in effect the Court giving you those chances. So coming in here now and asking, "Well, the slate's clean. This is the first time I've asked you, Judge, for a chance, a second chance," that's not technically true. You've asked me, through Mr. Hernandez, for multiple chances and those chances have been given and wasted.

So there's -- And continuing drug use, continuing participation in the drug market, even as a personal use buyer, it's almost impossible to show by clear and convincing evidence that you're not going to continue to pose a danger when you do that. I cannot just focus on the last 30 something days and say that those 30 something days, you know, constitute clear and convincing evidence that you won't flee or pose a danger. That's just not the case.

On that basis, I am going to order you detained pending your Final Revocation Hearing in both cases.

Anything further from the Government?

MS. OHLHAUSEN: No, Your Honor.

THE COURT: Mr. Willhelm?

MR. WILLHELM:  Not at this time, Your Honor.

THE COURT:  All right.  Mr. Goodan, you'll remain in custody pending your Final Revocation Hearings, and we are adjourned.  Thank you.

(Hearing adjourned at 11:10 AM.)

CERTIFICATE OF OFFICIAL REPORTER


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the electronically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of August, 2024.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER